Ladies and gentlemen, please rise. This court is now in session. Good morning. You may be seated. And the clerk will call the next case. 321-0410, in the matter of the state of Elizabeth Manor's decease, Curtis Mid Wealth Management Co. v. Timothy Caskey v. Thomas Burke, in American Vegas, Falls Bay, found by James Kinserman. Mr. Kriegsman, you may proceed. Thank you, Your Honor. May it please the court. Your Honors, I think it's best to start with the standards of review in this case. And I have a steep hill to climb. Both for the oral contract and the factual findings and the fiduciary duty in this matter, my standard to overcome is a manifest way to the evidence. And that means that only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence are those findings by the trial court reversible. And as it goes for the claim of the fiduciary duty, it's also a manifest way to the evidence. But as cited in the A.T. Kearney case in our briefs, the real question in this appeal is whether plaintiffs actually put special trust, confidence in the defendant, whether he consequently dominated and influenced them. Those are the factual findings for a fiduciary relationship to exist. Now, given what we're talking about here, my focus will mainly be on the facts in this case. You'll notice in Eppley's response, he goes to great lengths to show my client being held in contempt, procedural history of the case. That's not what we're arguing here. We're not appealing that my client was held in contempt. He was. We're not appealing that my client didn't take money. He did. What we're appealing are legal standards based on the actions that occurred. In this situation, Top Line Farms was owned by Elizabeth Mathers. At the time the contract was entered into, Elizabeth Mathers was under guardianship action, and her property was being managed by a trust company. She also had an employee named Garrett Lampe who testified in the underlying cause and was her farm manager for many years. Mr. Lampe hired American Angus Hall of Fame and Tom Burke in 2019 to run what they called a disbursement sale, which was all of the Angus cattle and embryos that remained in her stock as her health was declining and no one in her family wanted to continue the business. Mr. Burke handled the marketing, the auction, and the collection of funds of that sale, as supported by the evidence. The sale went off. Mr. Burke and his company began collecting funds, and during the course of that collection, as admitted by Mr. Burke throughout, he took some of those funds and lent them to a third party that were not returned. That's what led us to the current litigation. At that point, Mr. Burke admitted that he owed the funds. A citation was filed by the estate to recover those funds. My client never denied owing them. He did return those funds a little over a year after the auction occurred. The amount of those funds was also agreed to later on at a later hearing by the petitioner in the estate, so the accounting was agreed to. Documentation had been provided. Evidence was presented by Mr. Lampe specifically, who was under my subpoena, to attend the hearing on the accounting. The issues that we raise on appeal specifically are that Judge Bauer, the underlying trial court judge in this matter, found that my client's guaranteed the funds for collection. That means, in Judge Bauer's eyes, that if someone didn't pay, my client agreed to pay, which is not part of the evidence presented in this case, regardless of credibility. Judge Bauer clearly thought my client lacked credibility, but all the numbers that he presented were agreed to. But he clearly did not think that my client was credible. But I think that the clear evidence in this case comes from Garrett Lampe, who was the appellee's employee, who stated that a lot of times in these situations, people get credits. People buy cows. Cows are not perfect. Cows are supposed to be bred. If they don't breed, then obviously that sale is not worth the purchase price. So to hold my client accountable when he's not a veterinarian, he doesn't check these things. He just markets based on the information provided for Top Line's cattle is illogical and outside the evidence that was presented, both by my client and by their employee. So I think that that was unreasonable, arbitrary, and not based on the evidence for Judge Bauer to find that my client agreed to pay those funds, even though they were uncollectible. And further on that issue, my client has no cause of action, not his cows. How is he going to sue the buyers for not paying if they're not his cow? So I think that's unreasonable based on the evidence presented. As far as the fiduciary duty goes, I don't think that there's a question that they trusted my client to run the auction. My client was not an employee at Top Line Farms. They had done business previously, and Mr. Lampe and Mr. Burke had done business. Mr. Lampe was an experienced farm manager. He understood what he was doing, and he understood what he did when he hired him. There was no evidence presented that Mr. Burke dominated or influenced the estate. We agreed. He took the money. That's conversion. It's not a breach of fiduciary duty. He paid the money back within a time period that was commensurate with what the evidence showed to be typical in these situations. Mr. Lampe testified that one to two years for collections on these matters was typical. Most of these guys buy and sell back and forth. They receive credits. They receive debits, and those accounts settle later on. In this situation, it was slightly different because they were liquidating the stock, but that doesn't mean that that changes the fact what the normal course of business was in these situations. You agreed? Yes. You sure? This was different, though, because they were doing, at least they were going to do the billing. That was different than previous. Sure. And they were going to do the collections, whatever that meant. That was different than previous engagements, correct? Correct. But you don't feel that that creates a fiduciary relationship? I don't, just because I don't think that my client demonstrated the influence and domination factor as cited in the case law in the briefs. And since I'm asking a question now, what was the compensation that Mr. Lampe testified to on the previous engagements they had? It was the same percentage, Judge, 5%. Okay. So there was no increase for that extra work. Had they ever had anything in writing in the previous dealings? Everything was always? I don't mean to interrupt you, Judge. No. Yeah, everything was always on a handshake. I have nothing further. If there are no other questions, then you will have five minutes for rebuttals. Thank you. Thank you. Mr. Cassidy, you may proceed. Thank you, Your Honor. If there's a court counsel. I'm not going to belabor the facts, but I do think it's important in this case to go up through the procedural history. And it's not to show the contempt findings against Mr. Burke, although they were there. It shows that this was a little more than just I owed the money and I was going to pay it back. It took some time. But pretty much everything the counsel said as far as the facts, although not complete, is accurate except there was never an agreement that $377,000 was the amount owed. And I'll get into that. But the agreement was, before the trial court, was that Burke or American Angus, their interchangeable stipulated that they owed $377,000. What the record shows is we felt there was more than $377,000, but we would agree to accept that payment subject to further accounting. And, in fact, the court even entered into order when the payment was received that this real estate sale, which I'll get into, that Mr. Burke was to escort an additional $100,000 pending a final accounting based upon our representation that we felt there was more due. So there was never an agreement to that accounting. It had to be adjudicated. Mr. Cassidy, just so I understand, and maybe if you have a cite for me, know where to find it, you said there was no stipulation. My impression from reading the briefs and looking at the file was that there was a stipulation, which to me means there was an agreement as to what the proceeds of the sale were and how much was owed, at least for the sale. I'm not talking about the attorney's fees or any other things, but the sale. There was a stipulation agreement that the gross sales proceeds was $855,660. Okay. The obligation of the sales agent here was to pay all the expenses of sale, and after their commission was to pay the net proceeds to Topline, which is the estate. As matters moved forward, the thing that was stipulated to you, it was – I don't have the cite off the top of my head in the record, but it's very clear that Mr. Burke admitted in his testimony, it may have been in October or the November hearing, I'm going to get into there, that they did owe $377,000, at least. I underscore at least. So that doesn't sound like a stipulation to me. That was not a stipulation. That was clear on the record. It was not a stipulation. We maintained to the trial court, we believe that the – the process, as they admit, but we maintain there's more owed and we need a hearing on the full accounting. I don't want to stop you from making that. So if I can move quickly, your Honor, through the procedural history. The auction was on October 25 of 19. Libby Mathers died a month and a half later on December 14 of 19. On December 31 of 19, and I think this is important, Burke paid himself $42,783, which was 5% of the gross sales proceeds of $855,660. On February 10 of 20, the petitioner below in the ampli in this case, first mid, was appointed administrator of the estate of Mathers. There had been no accounting or full payments received. So on July 17 of 20, the estate filed its petition for issuance of citations to discover and recover assets under Section 16-1 of the Appropriate Act against both Burke and American Angus to get a full accounting and to get recovery of this sales proceeds. The court set the hearing on the citations for September 16 of 2020. Neither Burke nor any representatives of American Angus appeared. The court on that day issued a rule to show cause why they should not be held in contempt for failing to appear and set the hearing on the rule to show cause for hearing on October 16 of 20. On that day, Burke did appear. He testified via Zoom. He didn't appear in person. And I laid his testimony out in my brief. I'm not going to prolong, but to paraphrase, he testified to what the arrangement was that American Angus collected all the funds. He admitted that the money belonged to, at the time, Elizabeth Mathers, that American Angus was to pay all the expenses and the net proceeds were to go to Libby Mathers. Libby's Elizabeth. He testified, Burke testified that Libby trusted him to handle the funds on her behalf properly. He admitted they were not his funds. He admitted they were never segregated, but rather they were commingled with American Angus accounts. He admitted that he paid $377,000 of the proceeds to, quote, another person that should not have got it. And he admitted that he, Thomas Burke, was the person that gave the money to this other person. He said it was a law and never really explained it other than he couldn't ever get it back. On October 16 of 20 on the rule to show cause for hearing, the trial court also found that Burke had not produced the accounting records that they were ordered to produce in the citations that were issued months prior. So the trial court found Burke and American Angus in civil contempt for failure to comply with the citations to produce the accounting records. And he ordered them to be produced and set the matter for further hearing on November 18 of 20. Burke appeared on November 18 of 20 and had produced the records by that time, so the civil contempt was purged by the court. And it may have been, I'm starting to think, it may have been on this November 18 date, Burke testified that he was selling real estate in Minnesota to pay the $377,000, and at that time there was a discussion either through testimony or on the record with the court. The $377,000 Burke maintained was owed. We said that's at least the amount owed, but we believe there's more. It could have been, I'm pretty sure it was at that November 18 of 20 hearing. And then eventually the Minnesota property was sold and the $377,000 was paid, approximately 14 months now after the auction. There was still to be a hearing on the full accounting. During this interim period, we had filed a motion for attorney's fees based upon breach of fiduciary duty to recover for the estate the fees that were incurred in having to bring the citation proceedings to recover the money that should have been paid, accounted for and paid in the first instance. We also filed a motion for forfeiture of the compensation to Burke slash American Angus based upon their willful and deliberate breach of fiduciary duty. Now, if there's a fiduciary relationship here, there was clearly a willful and deliberate breach. I mean, counsel just admitted there was a conversion of funds. He didn't say it, but he had to sell personal assets to pay the funds that he converted, at least the $377,000. So what's at issue before the court now are three judgment orders. There was a judgment order on May 24, 2021, awarding the estate $35,277.85 in attorney's fees. There was an order entered on August 4, 2021, granting the motion to forfeit compensation and entering judgment in favor of the estate for $42,783, recalling that Burke paid himself, didn't pay his estate what he owed him, paid himself the 5% commission, which again, and I think is significant, is 5% of the full gross sales proceeds, not just the collected sales proceeds. And there was also a hearing on the accounting, and the trial court entered judgment in favor of the estate for $52,301. What was stipulated, too, is that represented accounts receivables, uncollected funds from the sales proceeds. There was all kinds of issues about credits from buyers, I guess, and I'm not a cattle auction guy, but there's credits to carry over. And that was finally removed as an issue, and we stipulated that the only thing that was issued before the trial court was the uncollected sales. So with that, as I understand the issues raised on appeal by the appellant is that the judgments for the attorney's fees and the forfeiture compensation are improper because it was never a fiduciary relationship. That's the only issue that's raised. They don't argue that there was no breach. They don't argue that the trial court otherwise committed error in awarding the $35,000 plus and the $42,000. I have a question regarding the guarantee of the collection of these funds. In the absence of a writing, in the absence of just based on what's here, how would the appellant, how would Mr. Burke go about being able to collect funds that weren't being willingly paid for something he didn't own and didn't have any right to? That came up before the trial court. That was a good question. First of all, he agreed to bill and collect. I'm going to answer your question, Your Honor. That question came up before the trial court, and the judgment by the trial court included an assignment of the account receivables to American Angus and Burke. It wasn't in the writing. It was an oral agreement. But the judgment for $52,300 or so also included language that those accounts, those amounts, accounts receivables are assigned to Burke and American Angus to collect them. But prior to that judgment, back in October of 2019, the day this auction went right, if I was a purchaser that didn't write a check and Tom Burke came to me and said, you have to pay for this cow or I'm going to sue you, he said, what right do you have? Show me what right you have to sue me for this payment. What would that have been? What evidence? Well, what should have happened is he should have gone to Topline and said, you know, we can't collect this for these reasons. That's a hypothetical because what the appellant's argument is isn't... But what you argued is that he had guaranteed, because there's no writing, and he guaranteed he was going to collect these, not just say, hey, you've got to write the check, like you go to an auction, you write the check, you get the money before, you know, at the end of the close of the auction. But that doesn't mean that the auctioneer is guaranteeing to, you know, be the collection agency. He said, we're going to take the check. It's not something that was specifically discussed. This word guarantee doesn't come from us. It comes from the appellant. I mean, he's the one that chose to say guarantee. And what he's talking about is not just a buyer that says, I'm not going to pay, I don't have the funds to pay. He's talking about, as he just said, they're not a vet. What if there's a, I don't know if this is even the right terminology, a defective animal that was sold to the buyers that dissatisfied, that said, I'm not paying for this. That's what they mean by guarantee. But that's what you, those are the things where you say, you know what, the next sale you get a cow. You know, you get, you know, a female that, you know, a lot of times, you know, sell breed stock, then there's no calf. And so they say, well, you know, to make it right by you, the next one we're either going to give you some off, or we'll give you another, you know, cow. But collecting all of those is different. Because you said in this 52,000 doesn't include, you know, the trades or the holdovers or the, you know, money that wasn't collected because somebody said it was, you know, we didn't get embryos that worked or we didn't get a cow that, you know, could deliver a calf. Those were excluded from this 52,000, correct? That's pure speculation. That's not in the record. The duty was on American Agents to account for the $855,660. There is no accounting that shows that there was $52,000 worth of cattle that was somehow defective. That just doesn't exist. It's mere supposition and speculation. You know, was it not collected because they didn't call the person? They didn't make any efforts? We don't know that. But the burden isn't on Topline to account for that $855,660. It's the burden's on them. And they argue, Your Honor, they argue that we shouldn't guarantee $52,000 in sales because of defective animals, but there's no evidence that there was ever defective animals. It doesn't exist. It's just an argument. That 52,000, that's not from this sale. Well, that is from previous. No, I'm sorry. With all due respect, it is not. There were arguments in the trial court, and I mentioned this earlier, about credits and things such as that, that would have made the accounting issue about $130,000. And we went in. We, during the accounting hearing, stipulated that those credits were off the table. We weren't claiming them. That we were only claiming the uncollected amounts, not credits. So then these weren't for defective animals. No. They were for things that weren't paid. So that's what I had asked you earlier about. I'm sorry, I misunderstood your question. At one point during the proceedings below, credits were an issue, and we removed those. My client removed them. In fact, we took a recess and went, no, I said, you know, they're probably entitled to these credits. We need to stop this, but we're entitled to the uncollected funds because the guy took a commission on them. I mean, so when they talk about guarantees for defective animals, and that's why they, not because they should have been credits, but because the amount's more collected because of a dissatisfied buyer, that doesn't exist in the record. There's no accounting of that. It's just argument is what I'm saying. I'm sorry, I misunderstood your question about the credits versus accounts receivable. And I circled around this a couple times. Keep in mind that Mr. Burke paid himself 5% of the $52,000 that he says he shouldn't have to pay. Well, why is he taking a commission on that? I mean, I think that act speaks for itself. It's an implicit admission that he should have collected the $52,000. Can I just say one thing about the fiduciary relationship? They gained influence because he accepted that trust and collected, I'm sorry, $855,000 of trust. But what they don't argue is there's two ways to create a fiduciary relationship. The other is a matter of law. And it's cited in our briefs, and it's actually cited in Appellate's brief as well, that as a matter of law, if there's a principal and agent relationship, a fiduciary relationship is created. They don't raise it that way. There's no factual dispute that there was at least a principal-agency relationship here. They were the quote-unquote sales agent. Right there, that creates a fiduciary relationship. You don't even need to reach the question of trust, you know, superiority and things such as that. One quick question. Do you disagree at all with counsel's representation? The testimony in the case was that it often would take to collect unpaid sums for these kinds of sales, one in two years, that that could be hanging out there for that long. There was testimony to that effect. Any contradiction to that? No, there was nothing in the record that would contradict that. But there was never any testimony that we could sit on $377,000 for a period of two years. But yes, I do not disagree with that testimony. This is O'Brien. I've got a couple of them. That's all right. We're going to start our day here slow. Sorry. No, that's our fault. I didn't ask a question yesterday on my first day here. The previous relationship or engagement, I use that term, they have to testify that this is 10, 11, 12 different sales that they had for your client. Was there a fiduciary relationship on those occasions? No. They did not collect funds. My client, in those prior relationships, collected the money. Building collected. In those previous relationships, do you disagree that it was a 5% commission? Or is that evidence or is that a question that you can't answer? Did Lampe ever testify that? I don't recall that that came up, but I'm not going to deny that. I can't deny that. Counsel said that that was the case. The record will show whether or not that was a testimony. The next logical question is was it 5% of gross sales as an auctioneer is running the block, so to speak. Or not so to speak. That's the term, I guess. I'm going to presume a bit. On the prior sales, I would presume it was 5% of the gross sales. Gross.  But you are arguing that it supports your position that it's not 5% of the gross sales this time because they were collecting. Because they were collecting, yes. It just doesn't make sense. It's not reasonable to say, I'm going to take 5%. I mean, they could have said, I'm not going to collect $100,000, $200,000. But on the previous occasions, they performed the services not in a fiduciary relationship of running the game, so to speak. They were on the block. They ran the auction. They brought the cattle out. They had the skills to get people to bid the most money on these cattle with the knowledge that they had. Why would that change? Just because they just volunteered allegedly for another duty. Well, it's because it was a dispersal sale. There's testimony that this was different. Garrett Lamp testified this was different. And Jeremy Hague, who formed this contract for American Angus, he didn't testify. But Lamp testified that he's told, hey, we can't collect on a dispersal sale. Libby's in a guardianship. It's going out of business sale, to put it simply. And so they said, well, we'll build and collect then. It was different because it was a quote-unquote dispersal sale. Thank you, Mr. Kessler. Were you both trial counsel all the way up? Yes. Yes, both of us were. I just have one kind of question. So first mid-wealth managers, they were not involved until after Libby passed away. I think they may have had the guardianship as well before the end. There was some succession, but I think during the auction sale, the first mid would have been the guardian. And they didn't have any oversight, didn't do anything? They relied on Lamp, Mr. Garrett Lamp. They did get involved afterwards and constantly trying to contact American Angus and where's the accounting, where's the money, and eventually they hired me to file the petition for citation. Thank you, Mr. Kessler. Mr. Creason for rebuttal. I won't waste a lot of your time with rebuttal. I just wanted to make a couple things clear. I think I misspoke during my initial argument when I said that our accounting was stipulated to at the 377. That's not actually accurate. As Mr. Cassidy stated, we had some testimony during the final accounting, and then all of our numbers were stipulated too. I would like to clarify too on the unpaid, uncollected $54,000 approximate dollars. There was no evidence presented as to why that money was uncollected, just that it hadn't been paid. So they didn't present evidence that these people were just refusing. We didn't present evidence that these cattle were defective. Does it even matter? No. That's my point. And just a final statement. Mr. Cassidy made a comment about peer speculation, and I think what he's asking you to do is speculate much like the trial court did as to what the terms of the contract were. I think that it's a step too far, again, to say that, and I use the word guarantee, and when I say that, I mean guarantee the collection of the funds. My client is essentially responsible for that money as a result of that judgment. To me, that's a guarantee from a legal perspective that the judge inferred on my client, not based on any evidence presented. And it was speculation to do that. So as far as the fiduciary goes, again, I don't feel that we were in a position of authority. I mean, it was an arms-length transaction. Yes, we handled funds. Yes, my client mishandled them, paid those funds back. So as a matter of law, the reason why we ask that the fiduciary be tossed out would be that it would be remanded on both of the forfeiture issue and the attorney's fees issue for a further hearing. Thank you. Thank you, counsel. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible. And with that, we will stand in recess until I hear from you.